# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

YOLANDA RIVERA,
     Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,
     Defendant.

No. 3:17-cv-01760 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Yolanda Rivera moves to reverse the decision by the

Social Security Administration ("SSA") denying her claim for disability insurance benefits.

Mot. to Reverse, Doc. No. 37. The Commissioner of Social Security[1] moves to affirm the

decision. Mot. to Affirm, Doc. No. 35. For the reasons set forth below, Rivera's Motion to

Reverse (doc. no. 37) is DENIED and the Commissioner's Motion to Affirm (doc. no. 35) is

GRANTED.

### Background

Rivera filed a motion for leave to file excess pages on August 17, 2018. That request was

denied. On April 4, 2019, Rivera renewed her request for permission to file excess pages. I

granted the request, in part, and limited the brief to seventy pages. What followed was a ninety-

nine-page brief with lengthy quotations to the medical record. Rivera's Memorandum of Law

far exceeds the extended page limit granted by the court. Nevertheless, in the interest of

efficiency, I decline to dismiss the motion on technical grounds and will proceed to the merits.

---

[1] The case was originally captioned "Yolanda Rivera v. Nancy A. Berryhill, Acting Commissioner of Social Security." Since the filing of the case, Andrew Saul has been appointed the Commissioner of Social Security.

Because the parties were unable to stipulate to the facts of this case, a general procedural and medical chronology follows.

A. <u>Administrative Proceedings</u>

Rivera is a 47-year-old former warehouse worker with a ninth-grade education. She is separated from her husband and lives with her two children. After 23 years of employment, Rivera quit her warehouse job in 2011, citing difficulty "bending, pushing carts, pulling carts," placing orders and dealing with customers. Tr. of ALJ Hr'g, R. at 87.

Rivera filed an application for supplemental security income ("SSI") on July 17, 2014. ALJ Decision, R. at 10. She later filed an application for Disability Insurance Benefits ("DIB") on July 23, 2014. *Id.* In both applications, Rivera alleged a disability onset date of April 24, 2009. However, on the record and through counsel at the ALJ hearing, Rivera amended the alleged disability onset date to February 1, 2013. At the time of the alleged disability onset, Rivera was 41 years old. Rivera identified her disability as "depression, panic attacks, VP shunt in the head, lower back pain, herniated lumbar disc, anxiety, see[s] shadow[s] and hear[s] voices, anemia, behavioral health problem[s] [and] sciatica." Disability Determination Explanation, R. at 162. The SSA initially denied her claim on April 8, 2015, and again on reconsideration on December 16, 2015, finding that "based on the evidence . . . [Rivera could] adjust to other work that is less strenuous, and simple and repetitive in nature." *Id.* at 186. Rivera requested a hearing before an ALJ on January 21, 2016, and a hearing was held before ALJ John Noel on March 2, 2017. Request for Hearing, R. at 252, Tr. of ALJ Hr'g, R. at 62.

B. <u>Hearing</u>

At the hearing, the ALJ questioned Rivera about her conditions, work history, and ability to perform daily living functions. Tr. of ALJ Hr'g, R. at 62−111. Rivera testified that she could

2

walk approximately half a block using a cane before she needed to stop and rest.  *Id.* at 71.
Rivera also testified that she could pick up ten pounds of weight, sit for ten to fifteen minutes,
and stand for five minutes.  Rivera described needing assistance with activities of daily living,
such as cooking, laundry, cleaning, and grocery shopping.  *Id.* at 74.  She testified that she drove
short distances and spent most of her days watching television and sleeping.  *Id.* at 75.

During the hearing, Rivera testified that she is a self-professed hoarder who refuses the
help of a visiting nurse because she is embarrassed to have visitors in her home.  *Id.* at 88.
Although she manages the finances for the home, she has borrowed money from her mother to
prevent eviction for non-payment of rent and to prevent her utilities from being shut off.  *Id.* at
84.  Rivera testified that she has been sued for causing automobile accidents, and she should not
be driving; however, her anxiety disorder prevents her from taking public transportation.  *Id.* at
90.  Finally, Rivera testified that she hears voices and sees shadows.  *Id.* at 102.  Rivera
described carrying on conversations with the voices, and she is convinced that "evil has
happened to me in the house."  *Id.*

The ALJ then considered testimony from Vocational Expert Howard Steinberg
("Steinberg"), who testified that, given Rivera's light work limitations, she could no longer
perform her previous work as a warehouse worker.  *Id.* at 105.  The ALJ asked Steinberg to
consider a hypothetical individual of the same age, education, and past work experience as
Rivera, who was constrained to working with the following limitations: could occasionally climb
ramps and stairs, occasionally climb ladders, ropes or scaffolds; could occasionally balance,
stoop, kneel, crouch and crawl; could only have occasional exposure to extreme cold or extreme
heat; could only have occasional exposure to wetness or humidity; could only have occasional
exposure to odors, dust, fumes, and other pulmonary irritants; could perform simple, routine

tasks; could apply limited judgment to simple work-related decisions; could deal with routine changes in the work setting but could not work on a team with coworkers; and could only have occasional contact with the public. Tr. of ALJ Hr'g, R. at 106. The ALJ asked Steinberg whether there were any jobs in the national economy that the hypothetical individual could perform. Steinberg testified that the hypothetical individual could work as an office helper, with approximately 207,000 existing jobs in the national economy; as a mail clerk, with approximately 122,000 existing jobs in the national economy; and as a chambermaid, with approximately 137,000 existing jobs in the national economy. *Id.* at 107. The ALJ further inquired if the jobs could be performed by a hypothetical individual who uses a cane for ambulation. Steinberg responded that only the job of a mail clerk would survive because most of the walking involves delivering and picking up mail using a cart, which can supplant the use of a cane. The remaining jobs "would be compromised . . . significantly and there would be a reduction in the number of jobs that would survive." *Id.* In other words, the "Office Helper [job] would reduce by 50% and the Mail Clerk [c]ould be performed." *Id.* at 108.

The ALJ then changed the hypothetical, adding that the hypothetical individual would not need a cane to ambulate, but could only stand or walk four hours in an eight-hour workday. With the removal of the cane restriction, Steinberg testified that the hypothetical individual could perform work as an office helper; a mail clerk; and a storage facility rental clerk, with approximately 43,000 existing jobs in the national economy. *Id.* at 108. Steinberg also testified that, based on his experience, the storage facility clerk job could be performed with a cane. *Id.* Finally, the ALJ asked Steinberg whether there were any sedentary jobs in the national economy that could be performed if the hypothetical individual did not require a cane to ambulate. Steinberg responded that there were various sedentary assembly production jobs that could be

performed under this hypothetical, such as a brake lining coater, with approximately 78,000 jobs in the national economy; and a surveillance system monitor, with approximately 45,000 jobs in the national economy. *Id.* at 109. The jobs could also be performed if the hypothetical individual used a cane to ambulate. *Id.* at 110.

Finally, the ALJ asked Steinberg whether any employer would allow the hypothetical employee to be off task for more than 10% of the workday. *Id.* Steinberg opined that "[i]t would be essentially impossible for the person to sustain employment." *Id.* The same opinion applied to the hypothetical employee who regularly missed one day of work a month. *Id.* at 110.

## C. The ALJ's Decision

On May 17, 2017, the ALJ issued an opinion in which he found that Rivera was "not disabled" and was capable of transitioning to other work that exists in significant numbers in the national economy. ALJ Decision, R. at 24. At the first step, the ALJ found that Rivera had not "engaged in substantial gainful activity since February 1, 2013, the alleged onset date." *Id.* at 13. At the second step, the ALJ determined that Rivera's impairments of degenerative disk disease, hydrocephalus with VP shunt, obesity, depressive disorder, and anxiety disorder were severe impairments that more than minimally limited Rivera's ability to engage in basic work activities. *Id.* At the third step, the ALJ determined that Rivera did not have an impairment, or combination of impairments, that meets or medically equals the severity of one of the listed impairments. *Id.* at 14. The ALJ then assessed Rivera's residual functional capacity and found that she could perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b); however, the ALJ's decision did not account for Rivera's use of a cane. The ALJ issued his decision on May 17, 2017, finding that Rivera was not disabled. *Id.* at 24. On September 8, 2017, the Appeals council denied Rivera's request for review. AC Denial, R. at 133.

5

D.  Medical Background

1.  *Mental Health Records*

On February 21, 2013, Rivera was evaluated at Charter Oak Health Center ("COHC") for medication management related to a diagnosis of major depressive affective disorder.  R. at 1816.  Rivera complained that the medication affected her ability to function because it made her feel tired.  *Id.*  During the visit, Rivera reported experiencing fleeting suicidal ideation; however, she did not feel she was an imminent danger to herself or others.  *Id.*  Three months later, Dr. Mercado-Martinez noted that Rivera was compliant with her medication and therapy.  Additionally, she noted an improvement in Rivera's daily home life.  R. at 1824.

In late July 2013, Rivera again expressed suicidal ideation and was referred by Dr. Ashok Parekh to the Emergency Department at Hartford Hospital for evaluation.  R. at 1830.  At the hospital, Rivera complained of chest pains, which she associated with increasing emotional stress and depression.  R. at 1238.  Rivera also admitted to experiencing suicidal ideation and auditory hallucinations.  *Id.*  On July 31, 2013, Rivera had a follow-up visit with Nurse Ana Caceres.  R. at 1836.  During the visit, Rivera again verbalized suicidal ideation with a plan to overdose on medication.  *Id.* at 1837.  As a precaution, Nurse Caceres limited Rivera's prescription to ten tablets.  *Id.*  In October, Rivera treated with Dr. Parekh who documented that Rivera's mood was "still depressed . . . primarily due to financial stressors."  *Id.* at 1843.  During the visit, Rivera explained that some utilities were shut off as a result of nonpayment.  *Id.*

On December 31, 2013, Rivera was admitted to Hartford Hospital after she verbalized a plan to jump out of a second story bedroom window, as well as experiencing "vague visual hallucinations and auditory hallucinations."  R. at 748.  Rivera was diagnosed with "major depressive disorder" that was "recurrent, severe with psychotic features."  R. at 749.  After an

eight-day hospital stay, Rivera was deemed stable for discharge and instructed to follow up with the adult day treatment program at the Institute of Living ("IOL"). *Id.*

On January 8, 2014, Rivera was transitioned to the IOL, where she was treated from January until mid-March. R. at 812–75. During the course of treatment, Rivera reported seeing shadows and expressed feelings of sadness and helplessness. R. at 812–13. Although Rivera was attentive and responsive during group therapy, the staff observed a continued unstable mood. R. at 828. On March 11, 2014, Rivera reported "thoughts of jumping out of her car or walking in front of a car or bus." R. at 868. An evaluation completed by Dr. Tilla Ruser and Todd MacDonald, APRN, on March 11, 2014 notes that Rivera had shown no improvement in her condition despite receiving treatment approximately two to three times a week. R. at 793. According to the evaluation, Rivera continued to report hearing voices and experienced a serious problem using appropriate coping skills and handling frustration. R. at 794. On the other hand, the treating providers deemed that Rivera could carry out single-step instructions and perform basic work activities with only a "slight problem." R. at 795. Two months later, the discharge summary completed by Dr. Ruser and Nurse MacDonald indicates an improved mental status, as well as orientation to "person, place [and] time," without any suicidal or homicidal ideations or obvious auditory or visual hallucinations. R. at 875. Rivera was referred to Catholic Charities Institute for the Hispanic Family for aftercare. *Id.*

On May 9, 2014, Rivera began treating with clinician Jennifer Schnapp of Catholic Charities. R. at 1384. Rivera reported experiencing "severe depressed mood, anhedonia, isolating and compulsive behaviors, including lock and appliance checking, apparent hoarding behaviors, difficulty concentrating, difficulty remembering things . . . anxiety and panic attacks." *Id.* On June 24, 2014, Rivera was evaluated by Jane Clark, APRN. R. at 1407. During a mental

status examination, Nurse Clark noted that Rivera reported seeing shadows and hearing garbled voices.  R. at 1404.  Rivera also exhibited "some paranoia" and seemed "unmotivated."  *Id.* Rivera was diagnosed with major depressive disorder with psychotic features.  R. at 1406.  On August 23, 2014, Nurse Clark indicated that Rivera's medications were "working," despite Rivera not taking her medications "all the time."  R. at 1408.  In November 2014, the progress notes reveal that Rivera's mood was stable and she reported feeling "less depressed."  R. at 1410. In March 2015, Rivera ran out of her medications.  R. at 1415.  Nurse Clark documents that Rivera was "angry and irritable."  *Id.*  During the visit, Rivera was counseled regarding missing her appointment in January.  *Id.*  Two months later, she reported that "restarting [the] medications helped her almost immediately."  R. at 1420.  Rivera, however, was angry that Nurse Clark would not complete her disability forms.  *Id.*  On August 4, 2015, at a follow-up visit with Nurse Clark, Rivera was advised to continue therapy because "changing medications [would not] make a difference."  R. at 1425.  Rivera was described as "sobbing," "feeling helpless, sometimes hopeless" and exhibiting anger about her disability forms.  *Id.*  In total, Rivera received treatment through Catholic Charities between May 2014 through August 4, 2015.  R. at 1384–1425.

Clinician Jennifer Schnapp and Nurse Clark completed and co-signed two Mental Impairment Questionnaires for Rivera's disability application.  The report dated August 18, 2014 details Rivera's diagnoses as "generalized anxiety disorder" and "major depressive disorder, recurrent, severe, with psychotic features."  R. at 898.  Rivera's judgment and insight were deemed "quite low . . . with regard to [her] understanding of her role in recovery, capability to recover [and] understanding of symptoms as [a] treatable illness."  R. at 900.  The remainder of the form was left blank, including the functional abilities evaluation.  R. at 901–02.  The report

dated September 1, 2015 includes a brief psychiatric history and a short description of Rivera's response to treatment, but the functional abilities section was again left blank. R. at 1428–32.

On October 7, 2015, Rivera began treating at Hartford Behavioral Health ("HBH"). During Rivera's evaluation, she exhibited difficulty recalling three words at two different intervals. R. at 1467. Rivera was diagnosed with major depressive disorder, recurrent and severe with moderate-severe anxious distress, and borderline personality disorder. R. at 1468. Although Rivera reported that her anxiety around people made it difficult for her to leave her home, Maybelle Mercado, PhD, LPC, notes that she waited 30 minutes in a crowded room, apparently without distress. *Id.* On October 28, 2015, Rivera treated with Dr. Cristina Sanchez-Torres. R. at 1470. Rivera reported experiencing audio-visual hallucinations. For example, Rivera detailed seeing shadow figures and family members that have passed away. R. at 1470. Furthermore, Rivera routinely "hears steps, people calling her name . . . [and] feels the presence of a young girl at her home." *Id.* During the visit, Rivera reported feeling "intermittent death wishes, with no intent or plan." *Id.* The exam notes indicate that Rivera's judgment and insight were limited. R. at 1472. With respect to Rivera's physical appearance, Dr. Sanchez-Torres recorded that Rivera needed the "help of a cane to walk." *Id.* The treatment plan included a recommendation for a visiting nurse to supervise the administration of Rivera's medications. R. at 1473.

In November 2015, Rivera returned for a follow-up visit with Dr. Sanchez-Torres. At the time, Rivera was non-compliant with therapy. R. at 1475. Dr. Sanchez-Torres again encouraged engaging a visiting nurse for medication management, but Rivera was not interested. R. at 1477. A month later, Rivera reported a slight improvement with the optimization of certain medications. R. at 1485. Despite the doctor's concerns with medication safety, Rivera

continued to refuse the services of a visiting nurse.  *Id.*  In January 2016, Dr. Sanchez-Torres observed that Rivera looked better and exhibited a brighter affect.  R. at 1488.  In February 2016, Rivera verbalized "wanting to die . . . and not knowing what she [was] capable of when she [went] home."  R. at 1493.  Rivera related that "she has jumped off buildings and has attempted to [overdose]" in the past.  *Id.*  Rivera was involuntarily transported to the emergency department at Hartford Hospital because of her worsening depression.  R. at 1494.  At the hospital, Rivera's physical exam revealed that she was "well-appearing, in no apparent distress" and there were "no acute signs in all four extremities," which were "non-tender to palpation."  R. at 1702.  Rivera again reported seeing shadows and hearing voices.  R. at 1702.  During a psychological assessment, Rivera was deemed a "low medical risk at this time," and she was discharged the same day.  R. at 1709–10.

In May 2016, Rivera treated with Kristen Stickles, LADC at HBH.  R. at 1496.  During the visit, Rivera exhibited difficulty with remote memory and her attention span was "unmotivated/indifferent."  R. at 1503.  Rivera also saw Dr. Sanchez-Torres for medication management.  R. at 1506.  During the visit, Rivera continued to express death wishes, but no clear suicidal ideation.  R. at 1510.  Despite her ongoing depression, Rivera was resistant to therapy.  *Id.*

On October 13, 2016, Rivera began treating with Dr. Alejandro Rangel at HBH.  R. at 2170.  During the visit, Dr. Rangel documents that Rivera "looks [in] pain," but she did not exhibit any delusional ideas and her memory was good for recent and remote events.  R. at 2171.  Additionally, Rivera's audiovisual hallucinations were less frequent.  *Id.*

In December 2016, counselor Kristen Stickles and Dr. Alejandro Rangel completed a medical report for the State of Connecticut Department of Social Services.  R. at 2083.  The

report was largely left blank. R. at 2086–88, 2091. The report notes, however, that Rivera's major depression and anxiety prevent her from working. R. at 2085. Rivera is also documented to experience "frequent bouts of crying [and] auditory and visual hallucinations." *Id.* The mental residual functional capacity assessment denotes a moderately limited capacity for most activities involving understanding, memory, sustained concentration, persistence, and adaptation. R. at 2089–90. With respect to interactions with the general public, the treatment providers deemed that Rivera was markedly limited and "[could not] usefully perform or sustain the activity." R. at 2090. The following month Rivera was discharged from HBH for missing appointments, noncompliance with treatment, and unresponsiveness to outreach attempts. R. at 2170.

2. *Other Medical Treatment Records*

On April 2, 2013, Rivera treated with Ana Caceres, APRN at COHC for symptoms of lower back pain and a rash on her lip. R. at 955. Nurse Caceres noted that Rivera experienced tenderness in her lumbar spine but exhibited a normal range of motion. R. at 956. Two months later, Rivera returned to Nurse Caceres with complaints of an abdominal pustular lesion and continued lower back pain. R. at 951. Following a neuromusculoskeletal exam, Nurse Caceres diagnosed muscle spasms accompanied by moderate pain with motion. R. at 952. Rivera was prescribed a topical ointment and a muscle relaxant. *Id.* In July 2013, an EKG performed at Hartford Hospital revealed marked sinus bradycardia and possible left atrial enlargement. R. at 1301.

In August 2013, Rivera presented with sharp, stabbing chest pain. R. at 944. Rivera was diagnosed with costochondritis and treated with over-the-counter Aleve. R. at 945. In November 2013, Rivera returned with recurring back pain that radiated to the left calf. R. at 940.

11

Nurse Caceres diagnosed Rivera's condition as chronic lumbago and prescribed nonsteroidal anti-inflammatory medications and muscle relaxers. R. at 942. Finally, in December 2013, Rivera went to the emergency department at Hartford Hospital complaining of chest pain. R. at 1247. A chest x-ray and an EKG were ordered. *Id.* The EKG revealed normal sinus rhythm but possible left atrial enlargement. R. at 1302. The chest x-ray was unremarkable. *Id.* Because there were "no acute findings to suggest ischemia on her EKG," and there was "low concern for AMI," Rivera was discharged from the hospital. R. at 1248.

On January 6, 2014, Rivera was evaluated at Hartford Hospital after she reported pain at the shunt site. R. at 1665. During triage, Rivera was observed ambulating without difficulty. *Id.* The consulting physician noted no neurological deficits and found that the shunt series was negative for any discontinuity. R. at 1676. As a result, Rivera was discharged back to the care of the IOL. *Id.*

On February 17, 2014, Rivera returned to the emergency department at Hartford Hospital complaining of shin pain. R. at 1680. The examining physician found that Rivera had good muscle strength and her back was generally non-tender to palpation, with the exception of pain over her sciatic foramen. R. at 1681. Rivera was discharged with prescriptions for Motrin and Valium. R. at 1682. On February 25, 2014, Rivera was seen by Dr. Bagdasarian of Vascular Associates of Connecticut for an evaluation of Rivera's varicose veins. R. at 802. Rivera presented with moderate edema in the left leg and varicose veins that were mildly tender to palpation. R. at 803. A "straight leg raise on the left side elicit[ed] severe pain down the posterior leg." *Id.* Dr. Bagdasarian prescribed compression stockings and encouraged Rivera to continue using anti-inflammatory medications. *Id.*

On March 18, 2014, Rivera was treated by Dr. David Spiro, a neurosurgeon at St. Francis Medical Group. R. at 2297. An MRI of Rivera's back revealed evidence of degenerative disc disease, with significant disc degeneration at L5-S1, resulting in foraminal narrowing on the left side and L5 nerve root impingement. R. at 2299. Dr. Spiro recommended a minimally invasive interbody fusion at L5-S1. *Id.* Dr. Spiro also referred Rivera to the emergency department to rule out deep vein thrombosis of the left leg. *Id.* A venous duplex study performed the same day at Saint Francis Hospital showed no evidence of deep venous thrombosis. R. at 879.

On May 2, 2014, Dr. Spiro performed a minimally invasive foraminotomy and medical facetectomy of the left L5-S1. R. at 884. At a follow-up visit twelve days later, Rivera was given a refill for oxycodone and Valium to control her breakthrough pain. R. at 889. During the exam, Rivera's cognitive function was normal and her memory was unimpaired. R. at 890. Dr. Spiro examined Rivera again on June 11, 2014 and found that she had a full range of back motion and no tenderness of the cervical spine on palpation. R. at 893. At the time of the visit, Dr. Spiro listed Rivera's main complaints as left leg pain and constipation. R. at 892. In August, Rivera "continue[d] to complain of back pain and leg pain." R. at 894. As a result, Dr. Spiro referred her to physical therapy. *Id.*

Rivera began physical therapy on September 9, 2014. R. at 1309. At her initial evaluation, Rivera reported that she was unable to walk or stand for more than ten minutes without pain. R. at 1310. By November 2014, her pain tolerance had increased to walking or standing for more than 45 minutes without experiencing pain. *Id.* On November 23, 2014, the physical therapist referred Rivera back to her treating physician to address her complaints of persistent pain. *Id.*

On September 16, 2014, Rivera saw Nurse Caceres for a routine physical exam. Nurse Caceres documented that Rivera suffered from lumbago with chronic lower back pain and left leg radiculopathy. R. at 917. Otherwise, the physical exam was unremarkable. Of note, Nurse Caceres observed a normal gait, and appropriate mood and affect during the visit. *Id.*

During a neurological follow-up with Dr. Spiro on March 4, 2015, Rivera reported experiencing greater pain than before the surgery. R. at 2302. Dr. Spiro noticed that Rivera walked with an antalgic gait and used a cane to ambulate. R. at 2302–03. In addition, Rivera exhibited a "decreased response to tactile stimulation of the entire left leg." R. at 2303. Dr. Spiro ordered a new MRI and renewed Rivera's prescription for diazepam and oxycodone. *Id.* On March 27, 2015, Dr. Spiro discussed the MRI results with Rivera. The MRI revealed "a near complete collapse of the L5-S1 disc space" and "severe foraminal stenosis on the left side causing exiting nerve root compression." R. at 2301. Dr. Spiro opined that Rivera's severe foraminal stenosis correlated with her pain symptoms. *Id.* Based on the neurologist's recommendations, Rivera agreed to undergo a minimally invasive interbody and posterior fusion. *Id.*

On May 28, 2015, Rivera underwent a minimally invasive interbody and posterior L5-S1 fusion with interlocking pedicle screws. R. at 1354. Although Rivera's pain was well-managed at the hospital, she reported persistent pain that reached a "ten out of ten" on the pain scale during a visit with Nurse Caceres on June 3, 2015. R. at 1366. Nurse Caceres observed that Rivera was using "medication more often than prescribed," and that Rivera required a walker to ambulate. *Id.*

At a post-operative follow-up appointment with Nurse Practitioner Sharareh Amin Hanjani, Rivera continued to report lower back pain and left lower extremity weakness. R. at

1445.  Nurse Hanjani noted that Rivera presented with a "gait problem," however, she remarked that "no antalgic gait was observed."  R. at 1447.  A straight-leg raising test was positive on the left side.  *Id.*  On July 22, 2015, Rivera reported no change in her overall symptoms after the second surgery.  R. at 1441.  During the physical exam, Rivera demonstrated a decreased response to tactile stimuli on the left leg.  R. at 1444.  A straight-leg raising test was positive on the left side.  *Id.*  Because the lumbar spine flexion-extension x-ray showed no evidence of instability, Rivera was referred to physical therapy three times a week for six weeks.  *Id.*  In September, Rivera complained that her left leg numbness felt worse after surgery.  R. at 1437.  A month later, a post-operative MRI revealed continued foraminal stenosis at the surgery level with scar tissue formation; however, Dr. Spiro opined that Rivera's subjective symptom of pins and needles was not consistent with the imaging results.  R. at 1436.

Between January 2016 and June 2016, Rivera visited the emergency department at Hartford Hospital on three separate occasions complaining of right shoulder pain in January; right ankle pain in May; and right hip pain in June.  R. at 1694, 1749, 1729–36.  On all three occasions, Rivera was prescribed pain medication and discharged.

In February 2016, Rivera began treating with Dr. Nieves Hornbeck, a primary care physician at COHC.  R. at 1910.  During the February visit, Rivera complained of right arm pain associated with a papule.  R. at 1915.  Dr. Hornbeck referred Rivera to a dermatologist.  In April 2016, Rivera returned to Dr. Hornbeck for a follow-up on bloodwork.  R. at 1918.  Dr. Hornbeck prescribed iron supplements to treat Rivera's anemia.  R. at 1923.  Rivera returned to Dr. Hornbeck in August 2016 with a complaint of low back pain.  R. at 2053.  Dr. Hornbeck observed that Rivera was using a cane and limping.  R. at 2055.  Rivera was prescribed Lidoderm patches to treat her back pain.  R. at 2056.

In October 2016, Rivera was admitted to Hartford Hospital with flu-like symptoms. R. at 2215–91. Rivera had an elevated white blood cell count. During the physical examination, Rivera exhibited a normal range of motion and she did not complain of numbness. R. at 2217. Rivera was discharged the next day when her white blood cell count and her temperature returned to normal. R. 2285.

On October 12, 2016, Rivera underwent a CT scan of her lumbar spine without contrast to determine the reason for her "persistent left leg pain and numbness." R. at 2080. The scan showed no disc abnormality, but "some encroachment of the neural foramina." *Id.* The radiologist found no evidence of recurrent disease and no central canal stenosis. *Id.* The radiologist reported that Rivera's foraminal narrowing at L5-S1 remained unchanged from 2015. *Id.*

In November, Rivera returned to Dr. Spiro to review her MRI results. R. at 2075. A physical exam revealed pain with left hip flexion and a positive straight-leg raising test. R. at 2078. Dr. Spiro reviewed the CT scan of the lumbar spine and determined that there was no significant stenosis or nerve root compression. R. at 2078–79. Dr. Spiro opined that Rivera's pain could be the result of residual nerve damage from surgery and the condition "could take a significant length of time to heal." R. at 2079.

On November 10, 2016, Rivera saw Dr. Hornbeck for leg pain, back pain, and anemia. R. at 2104. The physical examination was unremarkable, with the exception of Rivera's use of a cane. *Id.* A month later, Rivera returned to Dr. Hornbeck with complaints of low back pain without sciatica. R. at 2107. Dr. Hornbeck noted that Rivera walked with a mild limp and used a cane to ambulate. *Id.* She was advised to follow up with Dr. Spiro for pain management. R. at 2110.

Rivera followed up with Dr. Spiro on February 15, 2017. R. at 2292. Rivera's main complaints were significant numbness in her left leg and intermittent back pain. *Id.* Dr. Spiro determined that Rivera's back pain was chronic and referred her to a vascular surgeon for her leg pain. R. at 2295.

## II. Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e., an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does not have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national

economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)).  The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria.  *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry.  *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418.  If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five.  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).  At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he [or she] need not provide additional evidence of the claimant's residual functional capacity."  *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled.  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.").  I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole."  *Greek*, 802 F.3d at 374-75.  The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla."  *Brault*, 683 F.3d at 447–48.  Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Greek*, 802 F.3d at 375.  Unless the Commissioner relied on an incorrect

interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## III. Discussion

Rivera claims the ALJ erred in assigning little weight to the opinions of her treating sources, evaluating her medically determinable impairments, and discrediting her subjective complaints. Rivera also claims that the ALJ's opinion is not supported by substantial evidence. I will address each issue in turn.

### A. Issue One – ALJ's Weighting of Medical Evidence

Rivera objects to the ALJ's weighting and consideration of medical evidence provided by her treating physicians, as well as the state agency consultants. Her objections are generally governed by two standards: the treating-physician rule and the substantial-evidence standard.

"The treating physician rule provides that an ALJ should defer 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record."[2] *Cichocki v. Astrue*, 534 F. App'x 71, 74 (2d Cir. 2013) (summary order) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(c)(2)). When the ALJ gives controlling weight to a non-treating physician, and does not give the treating source's opinion controlling weight, he must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and

_____

[2] Originally a rule devised by the federal courts, the treating physician rule is now codified by SSA regulations, but "the regulations accord less deference to unsupported treating physician's opinions than d[id] [the Second Circuit's] decisions." *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418. After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a[n] . . . opinion," *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004), and provide "good reasons" for the weight assigned. *Burgess*, 537 F.3d at 129. But "where the ALJ's reasoning and adherence to the regulation are clear," he need not "slavish[ly] recite[ ] each and every factor" listed in the regulations. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order). Moreover, "[g]enuine conflicts in the medical evidence are for the Commissioner"—not the court—"to resolve." *Burgess*, 537 F.3d at 128.

The Second Circuit has cautioned that ALJs "should not rely heavily on the findings of consultative physicians after a single examination," and has advised that, ordinarily, a consulting physician's opinions or reports should be given little weight. *Selian*, 708 F.3d at 419; *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). In some circumstances, however, "the report of a consultative physician may constitute [substantial] evidence." *See Mongeur*, 722 F.2d at 1039; *see also Prince v. Astrue*, 490 F. App'x 399, 401 (2d Cir. 2013) ("consultative examinations were still rightly weighed as medical evidence"); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("the report of a consultative physician may constitute . . . substantial evidence.").

The substantial evidence standard, to reiterate from above, "means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault*, 683 F.3d at 448 (2d Cir. 2012) (quotation marks and citation omitted) (emphasis in original).

Rivera raises general weighting issues regarding all of the opinion evidence in the record. Although Rivera's legal arguments are difficult to decipher, the issue appears to center on whether the ALJ failed to properly consider and give appropriate weight to the opinion of her neurosurgeon, Dr. Spiro, as well as the opinions of mental health treatment providers Kristen Stickies, a licensed alcohol and drug counselor ("LADC") and Alejandro Rangel, M.D. ("Dr. Rangel"). Rivera appears to argue that the ALJ's summary rejection of the treating providers' respective opinions constitutes reversible error. Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Order ("Pl's Memo."), Doc. 37-1, at 72–73. The Commissioner argues that "significant evidence conflicted with Dr. Spiro's opinion, and [the ALJ] appropriately gave it partial weight." Defendant's Motion for an Order Affirming the Decision of the Commissioner ("Def's Memo."), Doc. 35-1, at 29. The Commissioner also contends that the ALJ considered Dr. Rangel's opinion and appropriately gave weight to the portions of Dr. Rangel's opinion that were supported by the record. Def's Memo, Doc. 35-1, at 33–34.

1. *Dr. Spiro's Opinion*

 a. Weight Assigned to Dr. Spiro's Opinion – Treating Physician Rule

Dr. Spiro is "'a treating source who is an appropriate specialist.'" ALJ Decision, R. at 17. In November 2016, Dr. Spiro completed a Department of Social Services Medical Report ("DSS Report"), in which he opined that during an eight-hour workday, Rivera could sit for three to four hours a day, stand for one hour a day and walk for one hour a day. R. at 2061. ALJ Nelson assigned Dr. Spiro's DSS Report partial weight because "the evidence [did] not fully support [his] opinion, particularly the restrictions on sitting, standing, and walking, and the need for a cane." ALJ Decision, R. at 17. Rivera contends that Dr. Spiro's "opinion should have been accorded controlling weight." Pl's Memo., Doc. 37-1, at 82. The question here is whether the

ALJ sufficiently provided "good reasons" for affording only partial weight to the opinion of Rivera's treating physician. *See Burgess*, 537 F.3d at 129. After reviewing the record, I conclude that the ALJ gave good reasons for assigning partial weight to the DSS Report prepared by Dr. Spiro on November 14, 2016.

During an office visit on November 3, 2016, Dr. Spiro observed that Rivera's reflexes, coordination, and muscle tone were normal. Also, Rivera showed "no antalgic gait." R. at 2078. Dr. Spiro also remarked that "[t]he patient's imaging [did] not demonstrate any worrisome findings [and] [t]here [was] no nerve root compression noted." R. at 2079. The DSS Report, prepared eleven days later, paints a different picture. There, Dr. Spiro indicated that the severity of Rivera's condition rendered her unable to work for a period of six months or more. R. at 2060. As noted above, Dr. Spiro opined in the DSS report that Rivera could stand/walk for one hour and sit for only three to four hours in an eight-hour workday. R. at 2061. The limitations suggested by Dr. Spiro in the DSS Report seem at odds with an in-office examination that was, for the most part, unremarkable; as well as, imaging results that "[did] not demonstrate any worrisome findings." R. at 2079. Thus, the medical findings contained in the progress notes conflict with the conclusion reached in the DSS Report.

In addition to the conflict between Dr. Spiro's progress notes and the conclusion reached in the DSS Report, the ALJ cites to inconsistencies between Rivera's subjective complaints of pain and weakness during office visits with Dr. Spiro and her observed behavior during emergency room visits. ALJ Decision, R. at 19. Take, for instance, Rivera's visit to the emergency room at Hartford Hospital in June 2016. R. at 1729. Rivera arrived alone in the emergency room "via private auto." *Id.* She reported that her son struck her with his car and knocked her down in the driveway. *Id.* Hospital personnel observe that Rivera "ambulate[s]

with a steady gait to triage;" additionally, there is no documentation that she uses a cane or a walker.  *Id.*  During the examination, Rivera displays equal strength in all four extremities.  R. at 1731.  Finally, the record shows that Rivera "does not have impaired mobility."  R. at 1735.  The June 2016 emergency room visit is at odds with office visits taking place in October 2016 and November 2016.  In October, for instance, Rivera visits Charter Oak Health Center with a "new" complaint of low back pain.  R. at 2054.  She is observed limping and using a cane to ambulate.  *Id.*  In November 2016, Rivera visits Dr. Spiro and "continues to complain of lower back pain with left lower extremity paresthesia and numbness."  R. at 2075. Rivera self-reports to Dr. Spiro that she "has to walk with a cane." *Id.*  In January 2017, Rivera "walk[s] to the urgent care" center demanding that her disability papers be completed by Dr. Hornbeck.  R. at 2132.  Dr. Hornbeck observes that Rivera is seated comfortably.  R. at 2133.  During the visit, Rivera denies experiencing any loss of strength or difficulties with balance.  R. at 2134.  Here again, there are inconsistencies between Dr. Hornbeck's observations and Rivera's subjective complaints of pain and weakness during office visits with Dr. Spiro.   Because the ALJ is permitted to weigh the conflicting information, I conclude that there are valid reasons for discounting the treating physician's opinion, especially the opinion rendered in the form of the DSS Report.

       b.  Listing 1.04 – Disorders of the Spine

Rivera admits that Dr. David Spiro "is the only treating source opining on physical limitations."  Pl's Memo., Doc. 37-1, at 82.  Rivera claims that Dr. Spiro's "report supports a finding of a listing level of impairment under 1.02."[3]  *Id.*  First, I assume that Rivera refers to the criteria required to meet the impairments listed in Appendix 1, listing 1.04 (disorders of the

---

[3] 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926) (the "Listings").
Listing 1.02 defines the major dysfunctions of a joint while 1.04 defines the major disorders of the spine.

spine), and not 1.02 (major dysfunction of a joint).  To meet the severity criteria of listing 1.04,

Rivera must establish spinal arachnoiditis (for purposes of Listing 1.04(B)) pseudoclaudication

(for purposes of Listing 1.04(C)) or the combination of nerve root impairment with consistently

positive straight leg raise tests (for purposes of Listing 1.04(A)).  The claimant, however, bears

the burden of proving that her impairments meet the particular Listing.  *See Perez v. Chater*, 77

F.3d 41, 46 (2d Cir. 1996) (explaining that the burden shifts to the Commissioner at step five,

after "the claimant satisfies her burden of proving the requirements in the first four steps").  In

the instant case, Rivera neither specifies which of the criteria she believes she satisfies, nor does

she point to the portion of Dr. Spiro's report that supports her claim.  The Commissioner argues

that the ALJ specifically considered Listing 1.04 (disorders of the spine) when he concluded that

Rivera's impairments, both singly and in combination, did not meet or medically equal a listed

impairment.  Tr. of ALJ Hr'g, R. at 14–15.  After reviewing the record, I conclude that there is

no medical evidence of nerve root impingement, spinal arachnoiditis or pseudoclaudication as

required by Listing 1.04.  Notably, the most recent scan of Rivera's lumbar spine performed in

October 2016 shows a "minimal broad-based disc bulge without central canal or foraminal

narrowing" on L3-4 and "some encroachment of the neural foramina bilaterally . . . [but] no

central canal stenosis."  R. at 2080.  Likewise, an x-ray of the lumbar spine performed in October

2016 showed "[n]o acute osseous abnormality of the lumbar spine."  R. at 2113.

Because I neither find any evidence, nor has Rivera provided any evidence, that her

condition meets the requirements of Listing 1.04(A), (B) or (C), Rivera has failed to show that

the ALJ erred in concluding that she did not meet or equal the impairment criteria for Listing

1.04.  *See Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 889 (2d Cir. 2007) (noting that it was

the plaintiff's "burden to demonstrate that her disability met all of the specified medical criteria

of a spinal disorder" and upholding the ALJ's decision that the plaintiff's impairments did not meet or equal Listing 1.04(A) because there was no evidence of motor loss accompanied by sensory or reflex loss or of nerve root compression); *Conetta v. Berryhill*, 365 F. Supp. 3d 383, 396–98 (S.D.N.Y. 2019) (holding that Plaintiff failed to show she met Listing 1.04 where there was insufficient medical evidence to show that she met all of the criteria); *Kelsey v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 437, 444 (W.D.N.Y. 2018) (affirming the ALJ's finding that Listing 1.04 criteria were not met because "Plaintiff's motor strength was consistently normal with no evidence of atrophy, as were her sensation and deep-tendon reflexes.").

### 2. *Kristen Stickles, LADC and Alejandro Rangel, M.D.*

Rivera correctly points out that the ALJ declined to give controlling weight to the opinions of Stickles and Dr. Rangel. Pl's Memo., Doc. 37-1, at 73. The Commissioner admits that Dr. Rangel's opinion regarding Rivera's moderate limitations in most areas of functioning was consistent with the opinions of Dr. Rau, Dr. Hill, Nurse Clark, and Dr. Lago. Def's Memo., Doc. 35-1, at 34. The Commissioner argues, however, that Dr. Rangel's opinions regarding "[Rivera's] ability to perform simple tasks and interact with others were inconsistent with other evidence" in the record. *Id.*

The medical record shows that since October 17, 2015 Rivera had been treated or examined by several providers at HBH. Of particular relevance are the opinions of two, Stickles and Dr. Rangel. In December 2016, both providers co-signed a Mental Residual Functional Capacity Assessment ("Medical Report") that consisted of a series of check-box forms. R. at 2089. Stickles and Dr. Rangel checked the boxes indicating that Rivera was moderately to markedly limited in all categories, including: understanding and memory, sustained concentration and persistence, social interactions and ability to adapt. *Id.* The Medical Report,

however, lacks any accompanying explanation for either the mental residual functional capacity assessment or the providers' determination that Rivera would be unable to work for twelve months or more. R. at 2085. The ALJ assigned only partial weight to the Medical Report explaining that "there [was] no support for moderate limitations in performing simple instructions or the finding of moderate problems in tolerating supervision." ALJ Decision, R. at 17. In particular, the ALJ concluded that Rivera possessed the residual functional capacity to "perform simple, routine tasks, use judgment limited to simple, work-related decisions, and deal with routine changes in the work setting." ALJ Decision, R. at 15. Rivera argues that the "ALJ only relied upon those portions of the opinions that supported a denial of the claim." Pl's Memo., Doc. 37-1, at 73.

The ALJ cites "activities inconsistent with serious limitations" as his reasoning for affording only partial weight to Stickles and Dr. Rangel's opinions. ALJ Decision, R. at 19. According to the Commissioner, Rivera's daily and weekly routine shows that she is capable of a higher level of function than indicated by the Medical Report. Def's Memo., Doc. 35-1, at 34. Take, for instance, Rivera's visit with Dr. Rangel on October 13, 2016. R. at 2032. During the visit, Dr. Rangel observed that Rivera was casually dressed; she was verbal and cooperative during the interview; her speech was coherent; and her thinking was goal-oriented. R. at 2036. Despite reporting feeling "[u]ncomfortable in groups of people," in October 2015 Rivera was observed waiting patiently for thirty minutes, without distress, in a crowded lobby. Pl's Memo., Doc. 37-1, at 24; Def's Memo., Doc. 35-1, at 34. The ALJ's determination that Rivera "can take her medications independently" is supported by Rivera's testimony that she sets reminders on her phone to manage her medications. ALJ Decision, R. at 22. ALJ Noel also refers to Rivera's testimony that she cooks, shops and performs household chores as evidence of a level of function

that is inconsistent with her allegations. *Id.* Finally, the ALJ refers to Rivera's ability to "care for her grooming and hygiene," connect to Facebook, and play games on her phone as proof of activities that she performs without any serious limitations. *Id.* Although the evidence could support the opposite result, there is substantial evidence in the record to support the ALJ's decision to give only partial weight to Stickles and Dr. Rangel's opinions. Given the conflict between the Mental Report and other evidence in the record, the ALJ did not err in choosing to assign partial weight to the opinions of Stickles and Dr. Rangel. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). Because there is substantial evidence in the record to support ALJ Noel's weighing of the evidence, I conclude that the ALJ properly weighed the opinions provided by Stickles and Dr. Rangel.

B. Issue Two – Credibility

1. *Inconsistencies with Rivera's Testimony Regarding Pain Symptoms*

Rivera takes issue with the ALJ's analysis of her credibility and claims of pain. Rivera asserts that the ALJ erred when he found that her statements regarding the "intensity, persistence, and limiting effects of [her] symptoms" were "not entirely consistent with the medical evidence and other evidence in the record." ALJ Decision, R. at 16. The Commissioner argues that "[a]n ALJ is not required to accept subjective complaints without question, but rather may exercise discretion in weighing complaints in light of other evidence of record." (citing *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)). I agree with the Commissioner.

Where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988) (citing *Carroll v. Sec'y*

*of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)); *see also Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999). The ALJ must make this determination "in light of medical findings and other evidence[ ] regarding the true extent of the pain alleged by the claimant." *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984) (internal quotation marks omitted) (quoting *McLaughlin v. Sec'y of Health, Ed. & Welfare of U. S.*, 612 F.2d 701, 705 (2d Cir. 1980)). Where an ALJ gives specific reasons for not finding the claimant credible, however, the ALJ's credibility determination "is generally entitled to deference on appeal." *See Selian*, 708 F.3d at 420 (citing *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order)). Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Credibility findings of an ALJ are entitled to great deference and . . . can be reversed only if they are 'patently unreasonable.'" *Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997).

Here, I conclude that the ALJ properly considered Rivera's subjective statements, identified the portions of Rivera's testimony that he did not find credible and cited specific examples in the record that undermined her testimony. Furthermore, the ALJ discussed what he viewed as inconsistencies with Rivera's allegations of pain, use of a cane, and weakness in her extremities. ALJ Decision, R. at 22. On March 2, 2017, for example, Rivera testified that she could not walk without the assistance of a cane. Tr. of ALJ Hr'g, R. at 67. Rivera also testified that she could not sit comfortably for more than ten to fifteen minutes at a time. *Id.* at 72. In January 2017, however, the record shows that Rivera visited the urgent care center at COHC. R.

at 2132.  The treating physician, Dr. Hornbeck, observed that Rivera sat comfortably during the visit.  *Id.*  Dr. Hornbeck neither observed nor documented the use of a cane.  *Id.*  Despite presenting with back pain, Rivera denied experiencing any difficulties with balance, coordination, loss of strength or painful extremities.  R. at 2134.  Previous visits to Dr. Hornbeck in November and December 2016, by contrast, document both the use of a cane and a visible limp.  R. at 2014.  During visits with Dr. Hornbeck, Rivera denied experiencing difficulties with balance, coordination, loss of strength or painful extremities.  In contrast, Rivera's visits to Dr. Spiro consistently include complaints of left lower extremity pain, numbness and weakness.  R. at 2053, 2075, 2292, 2297, 2302.  Rivera's brief hospital admission to Hartford Hospital in October 2016 is notable because a musculoskeletal examination revealed that Rivera had a normal range of motion.  R. at 2218–21.  A Braden Risk Assessment conducted at the hospital documents that Rivera walked frequently and there were no limitations with her mobility.  R. at 2261.  A neurologic exam also revealed normal strength in all limbs and sensation – a finding that is at odds with Rivera's complaint to Dr. Spiro of "left lower extremity paresthesia and numbness" a month later.  R. at 2075, 2268.  Hence, there is sufficient relevant evidence that "a reasonable mind might accept as adequate to support a conclusion."  Accordingly, I must uphold the ALJ's conclusions.  *Selian*, 708 F.3d at 417.

### 2.  *Inconsistencies with Rivera's Work and Application History*

Rivera contends that the ALJ erred as a matter of law when he determined that her "work and application history [did] not strongly support her allegations."  ALJ Decision, R. at 16.  Rivera takes issue with the ALJ's observation that statements she made to providers regarding her reasons for leaving work in April 2009 were inconsistent.  *Id.*  The Commissioner argues that "the ALJ's observation that [Rivera] gave different reasons for stopping working to different

people was both accurate and reasonable." Def's Memo, R. at 36. Because Rivera did indeed offer different reasons to different providers for her inability to work past April 2009, I conclude that the ALJ acted well within his discretion in concluding that Rivera was inconsistent with some of her claims. *See Burnette v. Colvin*, 564 F. App'x 605, 609 (2d Cir. 2014).

Next, the ALJ briefly referred to Rivera's prior applications for benefits, stating that "since leaving work and filing the current claim, [Rivera] filed multiple prior applications, all of which were denied." ALJ Decision, R. at 17. Rivera mischaracterizes the ALJ's statement, summarizing it as an accusation by the ALJ that Rivera has a track record of filing meritless claims. Pl's Memo., R. at 74. Because the ALJ did not rely solely on Rivera's work and application history in assessing credibility, but rather considered the entire record, including medical opinions, treatment record and objective medical tests, as well as Rivera's testimony and inconsistent statements, I need not reach any potential deficiencies in the ALJ's evaluation of Rivera's work and application history. Based on the foregoing, I conclude that the ALJ's determination of Rivera's credibility was based on substantial evidence and was not erroneous.

## IV. Conclusion

For the reasons set forth above, Rivera's Motion to Reverse (Doc. No. 37) is DENIED, and the Commissioner's Motion for Judgment on the Pleadings (Doc. No. 35) is GRANTED. The Clerk shall enter judgment and close the case.

So ordered. Dated at Bridgeport, Connecticut, this 30th day of September 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge